**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**COOKEVILLE DIVISION**

| | |
|---|---|
| **NICHOLAS ANTHONY WEST,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **NO. 2:14-cv-00102** |
| | )  **CHIEF JUDGE CRENSHAW** |
| **NANCY BERRYHILL, [1]** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Pending before the Court is Nicholas Anthony West's Motion for Judgment on the Administrative Record ("Motion") (Doc. No. 14), filed with a Memorandum in Support (Doc. No. 15). The Commissioner of Social Security ("Commissioner") filed a Response in Opposition to Plaintiff's Motion. (Doc. No. 16.) On November 19, 2014, this case was referred to a Magistrate Judge. (Doc. No. 3.) The Court hereby withdraws that referral. In addition, upon consideration of the parties' filings and the transcript of the administrative record (Doc. No. 10),[2] and for the reasons stated herein, the Court will grant Plaintiff's Motion (Doc. No. 14). This case is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum Opinion.

### I. Introduction

On February 22, 2008, West was found to be disabled as of November 1, 2006. (Tr. 17.) On February 10, 2012, it was determined that he was no longer disabled as of February 1, 2012.

---

[1] Nancy Berryhill became Acting Commissioner for the Social Security Administration on January 23, 2017.
[2] Referenced hereinafter by page number(s) following the abbreviation "Tr."

(Tr. 17.) This decision was upheld at the reconsideration stage of state agency review. (Tr. 47–50, 61–63.) West subsequently requested *de novo* review of this case by an Administrative Law Judge ("ALJ"). The ALJ initially heard the case on November 22, 2013, when West appeared without counsel and gave testimony. (Tr. 68–97.) A second hearing was held on March 20, 2014, where West again appeared without counsel and testified. (Tr. 35–67.) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the matter was taken under advisement until May 9, 2014, when the ALJ issued a written decision finding that West's disability had ended. (Tr. 14–34.) That decision contains the following enumerated findings:

1. The most recent favorable medical decision finding that the claimant was disabled is the determination dated February 22, 2008. This is known as the "comparison point decision" or CPD.

2. At the time of the CPD, the claimant had the following medically determinable impairment: post-traumatic stress disorder (PTSD). This [sic] severity of this impairment resulted in an allowance of benefits.

3. Through February 1, 2012, the date the claimant's disability ended, the claimant did not engage in substantial gainful activity (20 C.F.R. 404.1594(f)(1)).

4. The medical evidence establishes that, as of February 1, 2012, the claimant had the following medically determinable impairments: PTSD; major depressive disorder; mild bilateral carpal tunnel syndrome; mild degenerative osteoarthritis of bilateral feet; history of mild traumatic brain injury with residual headaches; history of left shoulder SLAP tear with surgical repair; tinnitus; mild low back pain; neck strain; and irritable bowel syndrome.

5. Since February 1, 2012, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525 and 404.1526).

6. Medical improvement occurred as of February 1, 2012 (20 C.F.R. 404.1594(b)(1)).

7. As of February 1, 2012, the impairment present at the time of the CPD had decreased in medical severity to the point where the claimant had the residual functional capacity to: understand, remember, and carry out low-level detailed tasks and instructions; maintain concentration, persistence, and pace for low-level detailed tasks

2

over a normal workday with appropriate breaks; relate appropriately to supervisors and coworkers but may have occasional difficulty interacting with the general public on a sustained basis especially in crowded situations and would be better working with objects rather than people; and able to adapt to routine changes in the workplace.

8.  The claimant's medical improvement is related to the ability to work, because it resulted in an increase in the claimant's residual functional capacity (20 C.F.R. 404.1594(c)(3)(ii)).

9.  As of February 1, 2012, the claimant continued to have a severe impairment or combination of impairments (20 C.F.R. 404.1594(f)(6)).

10. Based on the severe impairments present as of February 1, 2012, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: no frequent forceful or repetitive gripping or grasping with the bilateral upper extremities; no work around unprotected heights or dangerous machinery; no exposure to extremely bright lights or extremely loud noises due to headaches; and needs access to bathroom or restroom during all breaks and at lunchtime. In addition, the claimant can: understand, remember, and carry out low-level detailed tasks and instructions; maintain concentration, persistence, and pace for low-level detailed tasks over a normal workday with appropriate breaks; relate appropriately to supervisors and coworkers but may have occasional difficulty interacting with the general public on a sustained basis especially in crowded situations and would be better working with objects rather than people; and able to adapt to routine changes in the workplace.

11. As of February 1, 2012, the claimant was unable to perform past relevant work (20 C.F.R. 404.1565).

12. On February 1, 2012, the claimant was a younger individual age 18–49 (20 C.F.R. 404.1563).

13. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

14. Beginning on February 1, 2012, transferability of job skills is not material to the determination of disability because using Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

15. As of February 1, 2012, considering the claimant's age, education, work experience, and residual functional capacity based on the impairments present as of February 1, 2012, the claimant was able to perform a significant number of jobs in the national economy (20 C.F.R. 404.1560(c) and 404.1566).

16. The claimant's disability ended as of February 1, 2012 (20 C.F.R. 404.1594(f)(8).

(Tr. 19–22, 27–29.)

On September 9, 2014, and again on October 27, 2014, the Appeals Council denied West's requests for review of the ALJ's decision (Tr. 1–5, 6–8), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## II.     Review of the Record

The following summary of the medical record regarding the impairments the ALJ found to be severe is taken from the ALJ's decision:

> The claimant went to a psychological consultative exam in January 2012 wherein he reported difficulty with historical memory, focus, and concentration. The claimant admitted he was currently enrolled in college courses for mechanical engineering. He reported an active daily routine, which included meal preparation, hygiene tasks, homework, attending classes from 8:00 to 4:00, running errands, watching television, playing video games, spending time with his fiancé, shopping for groceries, and attending to household chores. The claimant drove himself to the appointment. He was observed to be cooperative and to complete background paperwork with detailed information. A mental status exam showed no abnormalities. In fact, the claimant admitted that his PTSD symptoms have become more manageable and diminished as time has passed by utilizing thought redirection and coping skills. The examiner stated that overall the claimant's PTSD appeared well managed with no observations of elevated anxiety or mood disorder (Exhibit 8F). ….
>
> Objective evidence regarding PTSD, major depressive disorder, and mild TBI begins on February 23, 2012, approximately two weeks after the date of the Cessation Notice (Exhibit 2B). When questioned at the November 2013 hearing, as to why he sought no medical treatment until then, he stated that his anxiety had returned, and he needed to get back on medication. ….
>
> [T]he claimant received no mental health treatment from April 2009 through February 22, 2012.[3]

---

[3] Notably, this statement, which is repeated throughout the ALJ's decision, is incorrect. For example, West met with Dr. Victor Pestrak, a licensed psychologist, at least eight times in 2011. (Tr. 319–21.)

On February 23, 2012, the claimant sought outpatient treatment and reported anxiety, hyper-vigilance, depression and poor concentration and memory. A mental status exam showed good hygiene, cooperative and pleasant attitude, normal speech, depressed and anxious mood/affect, linear and logical thought process, intact memory and cognition. The diagnostic impression was PTSD, major depressive disorder, and history of mild TBI with a GAF score of 65. The medications Wellbutrin and Mirtazapine were prescribed (Exhibit 18F/335, 338).

At a follow up visit in March 2012, the claimant's medication changed to Gabapentin 600 mg TID. The claimant reported increased stress with school and periods of irritability or anger; however, he felt like he could control it. The mental status exam, diagnostic impression, and GAF score remained unchanged (Exhibit 18F/334).

In May 2012, the claimant reported that he was not interested in PTSD group therapy. Again, the mental status exam, diagnostic impression, and GAF score remained unchanged (Exhibit 18F/327).

In June 2012, the claimant reported decreased irritability and anxiety and that his mood and concentration were "ok." The mental status exam, diagnostic impression, and GAF score remained unchanged. The dosage of Gabapentin was increased to 900 mg TID (Exhibit 18F/306). The medication was indicated for the claimant's irritability and anxiety in the context of his TBI (Exhibit 18F/221).

In August 2012, the claimant reported anxiety when in public places, nightmares, and intrusive thoughts but no flashbacks. He reported frequent irritability and mood swings and problems with long term memory; however, he admitted he continued to do well in school. He used his iPhone for memory assistance. He exercised daily. He described his concentration as "up and down." The claimant stated that he was unemployable in his current state, because he had no college degree; however, his goal was to use disability benefits to finish his mechanical engineering degree and then get a job in the field. The mental status exam was normal except for some "anxiety from the waiting room" (Exhibit 18F/266). The diagnostic impression was "PTSD, r/o Mood NOS, r/o malingering" with GAF score 65 (Exhibit 18F/268).

The record documents only two mental health treatment visits in 2013. In February, the claimant reported, "I am better" (Exhibit 18F/139). He reported that he and his fiancé were getting along and that he was doing fine in school except that he was "exhausted" with "some degree of decreased concentration" and unable to tolerate crowds (Exhibit 18F/124). The mental status exam showed good ability to follow conversation without problems and cooperative behavior. His GAF score was estimated at 61-70. The medication Busiprone was added for anxiety (Exhibit 18F/125). The last treatment note was in July 2013 when the claimant reported doing ok but anxious when leaving house with intrusive thoughts and some paranoia. He admitted he continued to do well in school. The mental status exam showed appropriate hygiene and attire, cooperative behavior, good eye contact, normal speech, normal mood and affect, linear and logical thought process, no paranoia or hallucinations, normal short and long-term memory, intact attention and concentration, and average intelligence/fund of knowledge. His GAF score was 65 (Exhibit 18F/121).

As for the opinion evidence regarding mental limitations, examining and non-examining psychological consultants generally agree that the claimant had mild restriction of activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and has experienced no episodes of decompensation, which have been of extended duration (Exhibit 8F, 12F, 15F). ....

The decision now addresses the claimant's severe physical impairment of bilateral carpal tunnel syndrome (CTS). The claimant reported no significant physical limitations at either hearing; however, EMG testing in September 2010 was consistent with bilateral CTS due to "slowing of sensory transmissions of the median nerve across the wrist." Treatment consisted of occupational therapy, bilateral Kenalog/Lidocaine injections, and bilateral wrist braces (Exhibit 7F/34, 47). In December 2010, the diagnosis was "very mild bilateral CTS" (Exhibit 7F/127). The record documents no further complaints of or treatment for CTS until August 2012 when EMG testing documented moderate findings (Exhibit 18F/96).

Although the claimant has received no recent treatment for headaches, the record does confirm residual headaches status post the mild TBI.

(Tr. 20, 23–26.)

With respect to the impairments that the ALJ found to be nonsevere, the following

summary of the medical record is also taken from the ALJ's decision:

> The evidence regarding mild degenerative osteoarthritis of bilateral
> feet consists only of an imaging report dated June 2010 (Exhibit
> 14F/32). The record contains no follow up complaints or
> treatment.
>
> The evidence regarding history of left shoulder SLAP tear with
> surgical repair consists of two physical therapy visits from October
> and November 2012. The physical exam in November showed
> that the claimant had normal range of functional motion and
> normal muscle strength in his bilateral upper extremities. The
> claimant chose to be discharged from physical therapy to continue
> with home exercises (Exhibit 18F/239). Imaging from 2012
> showed no significant abnormality and no change since the July
> 2008 report (Exhibit 18F/340-345). The record contains no follow
> up complaints or treatment.
>
> The evidence of record documents a remote diagnosis of tinnitus;
> however, the claimant alleges no difficulty stemming from this
> condition, and the record contains no follow up complaints or
> treatment.
>
> The evidence regarding mild low back pain and neck strain
> consists of only a chiropractic evaluation in March 2010. The
> claimant had normal range of cervical and lumbar motion (Exhibit
> 7F/37). Imaging from January 2012 showed no cervical or lumbar
> spinal abnormalities (Exhibit 18F/340-345).
>
> The evidence of record documents a diagnosis of irritable bowel
> syndrome for which the claimant only takes an over-the-counter
> herbal supplement with good result (Exhibit 18F/240).

(Tr. 21–22.)

### III.   Conclusions of Law

### A.  Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial

evidence supports that agency's findings and whether it applied the correct legal standards.

Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

## B. The Eight-Step Inquiry

The SSA periodically reviews recipients' continued eligibility for disability benefits. 20 C.F.R. § 404.1594(a). When a claimant challenges the cessation of benefits, the central issue is whether his medical impairments have improved to the point where he is able to perform substantial gainful activity. 42 U.S.C. § 423(f)(1); Kennedy v. Astrue, 247 F. App'x 761, 764

(6th Cir. 2007).  The Commissioner uses an eight-step sequential evaluation process to decide whether disability has ended and, thus, cessation of disability benefits is required.  20 C.F.R. § 404.1594(f).  Although the ALJ's review may cease at any point if there is sufficient evidence that the claimant is still unable to engage in substantial gainful activity, the complete sequential review poses eight questions:

1. Is the recipient engaging in substantial gainful activity?  If so, the recipient's disability will have ended.

2. If the recipient is not working, do his impairments meet or equal a listed impairment? If so, his disability will be continued.

3. If the recipient's impairments do not meet or equal a listed impairment, has there been any medical improvement in his impairments?  If so, the analysis proceeds to step four, if not, it proceeds to step five.

4. If there has been medical improvement, is it related to the recipient's ability to do work?  If so, the analysis proceeds to step six, if not, it proceeds to step five.

5. If there is no medical improvement, or if the improvement is unrelated to the recipient's ability to do work, does one of the exceptions to medical improvement apply?  If not, the disability has continued, if so, the disability is ended.

6. If medical improvement is related to the ability to do work, are the recipient's current impairments severe in combination?  If not, the disability is deemed to have ended, if so, the analysis proceeds to step seven.

7. If the recipient's impairments are severe, the SSA will assess his residual functional capacity and consider whether he can do his past relevant work.  If so, he will be found no longer be disabled.

8. If the recipient cannot do his past work, the SSA will consider whether the recipient can do other work given his residual functional capacity, age, education, and experience.  If so, the disability will be found to have ended.

20 C.F.R. § 404.1594(f).  There is no presumption of continuing disability.  Kennedy, 247 F. App'x at 764 (citation omitted).  However, the "ultimate burden of proof lies with the Commissioner in termination proceedings."  Id. (citation omitted).

### C. Plaintiff's Statement of Error

West first argues that the ALJ failed to give adequate weight to the 80% disability rating

he received from the Veterans Administration and, additionally, failed to explain the reason for

not giving it more weight. The Sixth Circuit has not set forth a specific standard regarding the

weight the Commissioner should afford a disability determination by the VA. LaRiccia v.

Comm'r of Soc. Sec., 549 F. App'x 377, 387 (6th Cir. 2013) (citing Stewart v. Heckler, 730 F.2d

1065 (6th Cir. 1984)). While the ALJ is "not bound to accept the disability rating made by the

VA," SSR 06-03p requires that the ALJ explain the consideration given to a VA disability

determination. Id. at 388; see 20 SSR 06-03p ("[E]vidence of a disability decision by another

governmental or nongovernmental agency cannot be ignored and must be considered.").

Accordingly, courts have routinely remanded cases in which the ALJ failed to properly weigh a

governmental or nongovernmental agency's disability decision or failed to articulate reasons for

rejecting the decision. See, e.g., LaRiccia, 549 F. App'x at 388; King v. Comm'r of Soc. Sec.,

779 F. Supp. 2d 721, 726 (E.D. Mich. 2011); Brown v. Colvin, No. 3:13-cv-1293, 2015 WL

752138, at *8–9 (M.D. Tenn. Feb. 23, 2015); Harper v. Colvin, No. 3:15-cv-1008, 2016 WL

4705390, at *9 (N.D. Ohio Sept. 8, 2016); Wilmore v. Comm'r of Soc. Sec., No. 12-14532, 2014

WL 320072, at *3–4 (E.D. Mich. Jan. 29, 2014).

In the present case, the ALJ stated that she "considered" the VA disability rating forms

and addressed the VA disability rating as follows:

> Lastly, the undersigned acknowledges that the claimant has been
> rated as disabled by the Veterans Administration, as pointed out by
> Nurse Lybarger and multiple forms contained in the record;
> however, the VA disability rating is not binding on the Social
> Security Administration's decision about whether the claimant is
> disabled. Adjudicators must make a disability determination based
> on the Act, our regulations, and our rulings. Adjudicators cannot

adopt a VA disability rating itself, because the question of whether a claimant is disabled is an issue reserved for the Commissioner (20 C.F.R. 404.1504, 404.1527(d)).

(Tr. 23, 26.)

Thus, the ALJ acknowledged the rating, but found that she could not give any weight to it because it was not binding upon the SSA. This is contrary to SSR 06-03p, which requires that ALJs "evaluate all the evidence…that may have a bearing on [their] determination … of disability, including decisions by other governmental and nongovernmental agencies" and "explain the consideration given to these decisions." See Harper, 2016 WL 4705390 at *9; LaRiccia, 549 F. App'x at 388. Although the ALJ is correct in noting that she cannot adopt the VA disability rating itself, the Sixth Circuit has held that other ALJs have erred in not considering VA ratings. (Tr. 23, 26); see LaRiccia, 549 F. App'x at 387-88 (determining that a VA disability rating should have been considered because the VA evaluates cumulative disability, just like ALJs' RFC assessments reflect all medically determinable impairments).

Mere acknowledgement that another agency decision is not binding is not proper consideration or explanation. See, e.g., Harper, 2016 WL 4705390 at *10 (holding that the ALJ's determination that VA ratings should be given no weight because they are not binding on ALJs does not satisfy SSR 06-03p). Such is particularly true because the VA's disability decision, which pertains to West's PTSD and TBI, parallels the ALJ's findings that those same impairments were severe. Further, the ALJ makes no mention that the VA increased West's PTSD disability rating by 20% during its 2012 re-evaluation, which is hardly irrelevant. (Tr. 290–91.) Simply put, the Court finds that additional consideration and explanation of this VA disability rating are required.

Due to the ALJ's failure to properly consider the VA disability rating and her erroneous reason for not sufficiently considering the rating determination, the Court will remand this case for proper and actual consideration of that VA disability determination and explanation of the weight given to the VA disability rating with proper reasons. Finally, the Court finds that it is not necessary to address West's later arguments because the ALJ's reconsideration of this matter on remand may impact the remainder of the ALJ's sequential analysis. In any event, even if the remaining assignments of error had merit, the result would be the same, *i.e.*, remand for further proceedings and not outright reversal for benefits.

## IV.    Conclusion

For the reasons stated herein, Plaintiff's Motion for Judgment on the Record (Doc. No. 12) will be granted and the case will be reversed and remanded pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum Opinion. An Appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE